[No. 10,895. In Bank.— March 29, 1884.]

THE PEOPLE, RESPONDENT, *v.* J. J. BUSH, APPELLANT.

CRIMINAL LAW — MURDER — JUSTIFICATION — CONFLICTING INSTRUCTIONS. — A defendant may justify a killing, although he was the assailant, if he, in good faith, endeavors to decline any further struggle before the act of homicide is committed; and it is no answer to an objection that a different instruction was given, to show that in another part of the charge the law was correctly stated.

ID — EVIDENCE — GOOD CHARACTER OF WITNESS. — Evidence of the good character of a witness cannot be given until his character has been attacked by evidence that his reputation for truth, honesty, and integrity is bad.

APPEAL from a judgment of the Superior Court of San Diego County.

The facts are stated in the opinion of the court.

*Z. Montgomery, T. J. Arnold, Levi Chase,* and *W. Jeff. Gatewood,* for Appellant.

*Attorney-General Marshall,* and *District Attorney Hunsaker,* for Respondent.

Morrison, C. J. — The defendant was convicted of the crime of murder, and having appealed to this court, presents several grounds of error, which he claims were committed by the court below.

1. On the trial of the case, one Maud Parsons was called as a witness on behalf of the defense, and on her cross-examination was asked the following questions : —

Q. — Did you know of Mr. Bush's going to shoot Mr. Ivy (the deceased) before this time; before the shooting took place ?

A. — No, sir.

Q. — Did you, about a week before that time, tell Lou Yancey that your uncle Jay was going to kill John Ivy ?

A. — No, sir.

Q. — You never told anybody that?

A. — No, sir.

Q. — You never told her that?

A. — No, sir.

Q. — Do you remember coming down at noon about a week before the killing, when your uncle and John Ivy were in the street and when they were quarreling?

A. — No, sir.

Q. — Did you at that time, or at any time, tell her that your uncle Jay was going to kill him ?

A. — No, sir.

Q. — Your uncle never told you that?

A. — No, sir.

Q. — Did your uncle Jay ever tell you, at any time, he was going to kill John Ivy ?

A. — No, sir.

At a later stage of the trial the following proceedings were had : —

Lou Yancey was called as a witness on behalf of the prosecution, and was examined as follows : —

Q. — What is your name?

A. — Lou Yancey.

Q. — Where do you live?

A. — In Julian.

Q. — Do you know Maud Parsons?

A. — Yes. I'm well acquainted with her.

Q. — Do you remember the time John Ivy was killed ?

A. — Yes, sir.

Q. — State if, at any time within a week previous to that, she said anything about her uncle going to kill John Ivy.

Objection was made to this inquiry on the two-fold ground that the matter upon which it was sought to impeach the witness was immaterial to the issues involved in the case, and also that the proper foundation had not been laid for the impeachment of the witness, as her attention had not been called to the surrounding circumstances, as required by section 2052 of the Code of Civil Procedure. It was also claimed that it was not cross-examination.

Objections overruled by the court, exception taken, and the examination proceeded.

Q. — State what she said to you. A. — A week before the time he killed him we went down town, and in the street we saw Mr. Bush and Mr. Ivy, and they seemed to be kind of hectoring or quarreling about something. We went back to the school-house. I asked her what the quarrel was about ? " Never mind," she said, " John Ivy will be sorry for all this." I said " why ?" She said, " because my uncle Jay says he always kept his word, and does what he says. He says he will kill John Ivy. He told me this morning he was going to kill John." I said, " does he say that ? " " Yes," she said, " he always keeps his word."

The ruling of the trial court in admitting the foregoing evidence, notwithstanding the objections of defendant's counsel, is the first ground of error relied upon on this appeal. We think the objection should have been sustained and the evidence excluded.

2. The second assignment is, that the court erred in admitting evidence on the part of the prosecution, in support of the character of the witness Valentine, " *whose character* [it is claimed] *had not been in any manner attacked by the defense.*" By section 2053 of the Code of Civil Procedure, it is provided that " evidence of the good character of a party is not admissible in a civil action, *nor of a witness in any action,* until the character of such party or witness has been impeached, or unless the issue involves his character." (See also §§ 2051 and 2052 of the same Code.

The *character* of the witness was not impeached in such a manner as to authorize the introduction of evidence on the part of the prosecution to sustain it. It is only in cases where the witness' character is attacked by evidence that his reputation for truth, honesty, and integrity is bad, that evidence on the other side is admissible.

3. The court gave the following instruction to the jury: "When parties by mutual understanding engage in a conflict with deadly weapons, and death ensues to either, the slayer is guilty of murder." The court proceeds: "If a sufficient time elapses between a quarrel and the agreement to fight to allow the blood to cool, the killing will be murder. The law assigns no limit within which cooling time may take place. Every case must depend on its own circumstances, but the time in which an ordinary man in like circumstances would have cooled may be said to be the reasonable time. *If between the quarrel and the mortal stroke given, the prisoner takes up any other design or business* not connected with the immediate object of his passion, or subservient thereto, it may be reasonably supposed that his attention was once called off from the subject of the provocation, *and any subsequent killing of his adversary without other provocation and with a deadly weapon would be murder.*"

It is claimed, on behalf of the defense, that the foregoing instruction is erroneous, for two reasons: First, that an encounter and killing under such circumstances comes within the statute of dueling; that the act is therefore punishable under that statute, and therefore does not constitute murder; and secondly, that the instruction charges the jury upon matters of fact.

Independent of the statute concerning dueling, it has been held that "when parties by mutual understanding engage in a conflict with deadly weapons and death ensues to either, the slayer is guilty of murder," and we do not think there is anything in the circumstances attending the killing in this case to take it out of the general rule. (*State* v. *Underwood*, 37 Mo. 225; § 870, 1 Bishop's Cr. Law; Lambert's Case, 9 Leigh, 605.) We are therefore of the opinion that the first objection to the charge cannot be sustained.

In the next place, it is claimed that the court invaded the province of the jury by charging them upon a matter of fact:

" If between the quarrel and the killing there is a space or interval of time sufficient for an ordinary man to cool, that may be deemed a *reasonable time* within the meaning of the rule on the subject. And, if between the quarrel and the infliction of the mortal wound, the mind of the defendant is directed to and is taken up by any other subject not in any manner connected with the cause of the quarrel, it may be reasonably supposed that his attention was called off from the subject of the provocation, and any subsequent killing of his adversary without other provocation and with a deadly weapon would be murder."

The instruction seems to have been copied by the learned judge from the case of *Commonw.* v. *Green,* 1 Ashm. 289, as the language is almost identical in the two cases. To the same effect is the rule laid down by Mr. Wharton in his work on American Criminal Law, pp. 181, 182. (See also *State* v. *McCants,* 1 Spear, 357; *Regina* v. *Fisher,* 8 Car. & P. 182; *State* v. *Sizemore,* 7 Jones, 206.)

On the authority of the foregoing cases the instruction complained of seems to be correct, and is not obnoxious to the second objection made by the defense.

Another, and the last point made by the appellant, is upon the following portion of the charge : —

" If the defendant himself brought on the fight and went into it armed, he cannot justify killing his adversary."

We think the foregoing is not a correct statement of the law concerning justifiable homicide. By section 197 of the Penal Code it is declared that homicide is justifiable in certain cases, the third subdivision of the section reading as follows:—

" When committed in the lawful defense of such person, or a wife, husband, . . . . but such person, or the person in whose behalf the defense was made, if he was the assailant, or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

The charge entirely overlooks the above provision of the Penal Code, and was therefore erroneous.

It is not true that a party cannot justify killing another simply because he is the assailant. If he, in good faith, endeavors to decline any further struggle before the act of homicide is com-

mitted, he may, although he was the assailant, justify the kill-ing.    In the case of the *People* v. *Simons*, 60 Cal. 72, this court held that " even if the defendant had been the assailant, if he had really and in good faith endeavored to decline any further struggle, before the homicide was committed, the killing might be justified in self-defense."    Other cases might be cited to the same effect; and it is no answer to the objection that an erroneous instruction was given, for the prosecution to show that in another part of the charge another instruction was given in which the law was correctly stated by the court.    In such a case it would be impossible to determine under which of two contradictory instructions the jury acted.    As was said by this court in the case of *People* v. *Wong Ah Ngow*, 54 Cal. 151, " an erroneous instruction is not cured by a correct statement of the law in another part of the charge."    (See also *People* v. *Campbell*, 30 Cal. 312.)

We think there was evidence tending to bring the defendant's case within the section of the Code last referred to; and whether he was the aggressor, and if so, he did in good faith try to avoid any further difficulty with the deceased before the homicide was committed, should have been left to the jury, by a proper instruction on the law applicable to the case.    For this erroneous instruction and the admission of improper evidence, the judg-ment must be reversed and the cause remanded for a new trial. It is so ordered.

McKEE, J , and THORNTON, J., concurred in the opinion of CHIEF JUSTICE MORRISON.

McKINSTRY, J., concurred in the judgment.

Ross, J., concurred in the judgment upon the ground last considered in the opinion.

SHARPSTEIN, J., concurring. — I concur in the judgment.

Evidence of the good character of a witness is not admissible until his character has been impeached.    (Code Civ. Proc. § 2053.)

This doubtless refers to impeachment, "by evidence that his general reputation for truth, honesty, and integrity is bad." (Code Civ. Proc. § 2051.)

. When witnesses contradict each other, the character of the one is as much impeached as that of the other; and there would be as good ground for admitting evidence of the good character of the one as of the other. And where a witness is impeached by evidence of his having previously made statements inconsistent with his testimony, it amounts to nothing beyond contradictory evidence. He must be asked if he made such statements, and if he answers that he *did not,* evidence that he did is admissible; if he answers that he *did,* that is the end of the matter.

I think the instructions referred to in the principal opinion were erroneous.

On other points I express no opinion.